[Cite as *Burson v. Ohio Environmental Protection Agency*, 2026-Ohio-2131.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| JARED BURSON | Case No. 2025-00174JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | Magistrate Gary Peterson |
| OHIO ENVIRONMENTAL PROTECTION AGENCY | <u>DECISION</u> |
| Defendant | |

{¶1} On April 3, 2026, defendant, Ohio Environmental Protection Agency (OEPA), filed a motion for summary judgment pursuant to Civ.R. 56. Plaintiff did not file a response in opposition. Pursuant to L.C.C.R. 4(D), the unopposed motion for summary judgment is now before the court for a non-oral hearing. For the reasons stated below, the court GRANTS defendant's motion.

**Factual Background**

{¶2} This case arises from plaintiff's allegations that OEPA engaged in discrimination, retaliation, and created a hostile work environment when OEPA failed to reasonably accommodate his disability and ultimately terminated his employment with OEPA.

{¶3} In defendant's motion for summary judgment, defendant argues that there are no genuine issues of material fact and judgment should be entered in its favor as plaintiff's claims fail as a matter of law. Defendant argues that plaintiff is essentially challenging OEPA holding him accountable for policy violations, including sleeping while on duty or being absent without authorized leave. In support, defendant filed: (1) the affidavit of Ben Rich; (2) the affidavit of Mark Johnson; (3) the affidavit of Naquetta V. Porter; (4) the affidavit of Sarah Groves (Lemanski); (5) the affidavit of Susan Vance; and (6) the deposition of plaintiff, Jared Burson ("Burson"), along with the accompanying exhibits referenced therein.

{¶4} Plaintiff did not file a response in opposition, including any Civ.R. 56 evidence for this court's consideration.

{¶5} The relevant pleadings and evidence submitted, viewed in a light most favorable to plaintiff, shows the following:

***Plaintiff's Initial Medical Leave***

{¶6} Plaintiff was hired full time by OEPA in January of 2016 as an Environmental Specialist 2 (ES2) in the Division of Surface Water (DSW) until his termination in June 2024. (Jared Burson Deposition, 17:8-18:12). Initially, when plaintiff began his employment with OEPA, he would report to work at the Lazarus building downtown where his job duties included administering the Ohio Credible Data Program, which oversaw the water-quality projects of external data collectors. (*Id.* at 19:12-20:9). At the end of 2020, plaintiff moved to the Groveport field office and worked as a fish biologist as a member of a field crew team. (*Id.* at 22:17-23:16).

{¶7} During field season, from June through mid-October, plaintiff worked as the crew leader and was approved for a more flexible schedule. (*Id.* at 24:7-13, 25:11-24). During plaintiff's employment at the Groveport field office, Ben Rich (Rich) was plaintiff's supervisor. (*Id.* at 24:1-6; Affidavit of Ben Rich, ¶ 1). There were other ES2s that worked at the Groveport field office who all had similar roles, but their specific collections were different. (Burson Dep. at 28:16-24).

{¶8} In Spring 2022, Rich informed plaintiff of concerns he had noticed about plaintiff's behavior and demeanor, noticing "something off" with plaintiff. (*Id.* at 55:1-7). Plaintiff stated that Rich also informed plaintiff that other coworkers had come to him and informed him that they were noticing "differences" in plaintiff as well, which plaintiff took to mean that Rich was concerned for plaintiff's well-being. (*Id.* at 73:19-74:4). Prior to April 2022, plaintiff was diagnosed with anxiety and depression, but plaintiff states that from 2018 to 2022, plaintiff had no mental-health-specific providers and had not spoken to Rich about his diagnoses of anxiety or depression. (*Id.* at 55:23-58:21). Although not formally diagnosed at the time, plaintiff also stated that he was subsequently diagnosed with bipolar disorder and post-traumatic stress disorder (PTSD). (*Id.* at 55:8-15). Plaintiff admitted that his mental health conditions were adversely affecting his work, leading to

drowsiness, fatigue, insomnia, irritability, lack of concentration, task paralysis, time blindness, and brain fog. (*Id.* at 71:1-24; *see also* Ex. A, interrogatory 21).

{¶9} Due to concerns from coworkers, Sarah Groves (Groves), a Human Resources Manager for OEPA, approached plaintiff and spoke with him about potential options, including options under the Federal Medical Leave Act (FMLA), if plaintiff needed to take leave to focus on his personal issues. (Burson Dep. at 74:22-75:24; *see also* Affidavit of Sarah Groves, ¶ 1). In April 2022, plaintiff opted to take FMLA leave and applied for disability leave to get his medical conditions "under control" as plaintiff acknowledged his symptoms were affecting him both personally and professionally. (Burson Dep. at 30:1-5, 37:9-17, 76:12-77:8; *see also* Rich Aff. at ¶ 4; Groves Aff. at ¶ 6). While plaintiff was on FMLA leave, he was formally diagnosed with bipolar disorder and continued to take medication to treat this disorder. (Burson Dep. at 70:10-19, 89:8-91:2). Plaintiff states that he took his medication in the morning, but that the specific medication made him very drowsy. (*Id.*)

{¶10} On May 1, 2023, plaintiff returned to work full-time as an ES2 under Rich's supervision. (Burson Dep. at 37:13-17; *see also* Rich Aff. at ¶ 5; Groves Aff. at ¶ 6). Although plaintiff's duties changed when he returned to work, his assignments were consistent with that of an ES2 and "based on the operational needs of the division." (Burson Dep. at 40:1-4; Rich. Aff. at ¶ 5). Moreover, management had discretion of the assignment of duties to ES2s so long as the assigned duties were consistent with the classification for ES2s created by the Ohio Department of Administrative Services (DAS). (Groves Aff. at ¶ 5, Ex. EE). Further, Rich affirms that any changes to plaintiff's duties were not punitive. (Rich. Aff. at ¶ 5). Plaintiff also admits that he did not lose any pay as a result of his new duties. (Burson Dep. at 42:8-9).

### *Plaintiff's Return to Work and Subsequent Voluntary Disability Separation*

{¶11} When plaintiff returned to work, Rich requested that plaintiff work on-site at the office to "support reintegration, supervision, and safety." (Rich. Aff. at ¶ 6). To that end, during the brief period of time between plaintiff's return to work and his first formal reprimand, Rich informally spoke to plaintiff about his tardiness and sleeping on the job. (Burson Dep. at 80:22-81:1, 83:4-84:11).

{¶12} Despite his conversation with Rich, plaintiff continued to struggle with timeliness. On May 9, 2023, Rich issued plaintiff his first formal reprimand for tardiness and failing to inform his supervisor that he would be late. (Burson Dep. at 79:18-80:21; Rich. Aff. at ¶ 9, Ex. B; Affidavit of Susan Vance, ¶ 5, Ex. B). According to Susan Vance (Vance), OEPA "utilizes progressive discipline for bargaining unit employees" like plaintiff, and the first formal discipline OEPA utilizes is a written reprimand. (Vance Aff. at ¶ 4). Additionally, Rich addressed discrepancies in plaintiff's sign-in records, noting that the building's entry and exit are monitored, and such inconsistencies are routinely identified and flagged. (Rich. Aff. at ¶ 7; Burson Dep. At 107:11-16). Rich also emphasized the need for plaintiff to maintain accurate timesheets in compliance with OEPA policy so that plaintiff did not get in trouble. (Rich. Aff. at ¶ 7). Rich affirms that no other ES2 under his supervision had the same tardiness or issues for failing to follow policy with the same frequency or to the same degree as plaintiff. (*Id.* at ¶ 10).

{¶13} Additionally on May 9, 2023, Groves emailed plaintiff with links to the Ohio Administrative Code (OAC) that addressed voluntary disability separations and the right to reinstatement. (Groves Aff. at ¶ 7, Ex. GG). Within that same email, Groves let plaintiff know that she was available to answer any questions that he may have. (*Id.*) Plaintiff never asked Groves any questions regarding the voluntary disability separation. (*Id.*) Thereafter, on June 5, 2023, plaintiff requested a voluntary disability separation. (*Id.*)

{¶14} Plaintiff was separated due to disability on June 7, 2023. (*Id.* at ¶ 9, Ex. FF). Pursuant to the OAC, plaintiff had two years from his last date of active work status to be reinstated to an ES2 position, which is the same position he held at the time of the separation. (*Id.* at ¶ 8). Shortly after plaintiff voluntarily separated, plaintiff saw a posting for his position online, specifically as it related to a fish biologist. (Burson Dep. at 97:11-21). Although plaintiff noted that the fish biologist position was his "dream job," plaintiff conceded that no one ever specifically informed him that he would be placed back in an ES2 position as a fish biologist. (*Id.* at 97:11-21, 99:5-15).

***Plaintiff's Reinstatement from Voluntary Disability Separation***

{¶15} Plaintiff eventually requested to be reinstated, but before he could be reinstated, he had to undergo an independent medical exam paid for by OEPA. (*Id.* at

101:21-102:1). On December 19, 2023, plaintiff was informed that he would be reinstated to the ES2 position with OEPA, and plaintiff was to report to the Central Office for his first formal day back in the office on January 2, 2024. (*Id.* at 102:13-103:16, Ex. C). The change in plaintiff's job location and duties did not affect plaintiff's pay, and plaintiff was still assigned duties consistent with that of an ES2. (*Id.* at 43:1-3; Groves Aff. at ¶ 10; Mark Johnson Affidavit, ¶ 3).

{¶16} Notwithstanding plaintiff's reinstatement, on December 28, 2023, before plaintiff returned to work on his first day back from separation leave, plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission (OCRC) because plaintiff felt that he had been demoted. (Burson Dep. at 103:17-105:16; 116:6-17). In this charge of discrimination, plaintiff also alleged that he was not permitted to work a hybrid schedule prior to his voluntary separation; however, he admits that he never requested any formal accommodation, including a hybrid arrangement, for his mental health conditions before taking a voluntary separation. (*Id.* at 105:6-21). Plaintiff asserts that, although he never formally requested hybrid work accommodations prior to his separation, he was the only employee supervised by Rich who was required to report to the office every day, a requirement that plaintiff contends Rich justified as being for plaintiff's own benefit. (*Id.* at 105:20-106:10). Rich maintains that any suggestion that the on-site work was for plaintiff's own good stemmed from concern for support and performance rather than any punitive intent. (Rich. Aff. at ¶ 6).

{¶17} On January 2, 2024, plaintiff returned to work at OEPA's Central Office, which was located in the Lazarus building downtown. (Burson Dep. at 38:9-16, 42:10-21; Groves Aff., ¶ 10). Plaintiff served as an enforcement coordinator, which involved handling various documents regarding different levels of enforcement cases within the DSW. (Burson Dep. at 42:4-43:21). Although plaintiff reported directly to Larry Reeder (Reeder), he was also in the supervisory chain of Larry's supervisor Joby Jackson (Jackson), the Assistant Chief of DSW, and Mark Johnson (Johnson), the Chief of DSW. (*Id.* at 44:1-45:10; Johnson Aff. at ¶ 2-3). Johnson affirms that plaintiff's job duties were assigned "based upon operational need, and it was not punitive because he had been on leave." (Johnson Aff. at ¶ 3).

{¶18} According to Johnson, OEPA's telework at DSW is not automatic and the telework policy applies equally to all DSW employees. (*Id.* at ¶ 4, Ex. L). Moreover, the policy requires a minimum level of in-office presence and "gives supervisors the discretion to authorize or deny situational telework based on job duties, operational needs, and performance." (*Id.*) Johnson explains that telework within DSW depends on the nature of an employee's duties, but enforcement work, which comprised the core of the plaintiff's responsibilities, requires in-person interaction and prompt communication. (*Id.* at ¶ 6). Johnson affirms that when reviewing plaintiff's request for expanded telework, management considered plaintiff's "duties, the need for in-person supervision during reintegration, and recent attendance and notification issues," along with plaintiff's medical complications stemming from anxiety symptoms and drowsiness from medication use. (*Id.* at ¶ 5, 7). After discussions with human resources (HR), management concluded that expanded telework was not feasible. (*Id.* at ¶ 5). Alternatives such as flexible scheduling and intermittent leave were offered to plaintiff as an accommodation. (*Id.*) Notwithstanding, plaintiff was informed by Jackson that plaintiff was allowed to work from home one day each week, but plaintiff chose to split this time up and work four hours from home on Monday and four hours from home on Friday. (*Id.* at ¶ 8; Burson Dep. at 136:1-8, 142:9-143:1).

{¶19} According to plaintiff, his workday started at 8:30 a.m., but he needed to inform management by 9:00 a.m. if he was going to be in late. (Burson Dep. at 135:16-24; 234:3-235:16). On January 11, 2024, plaintiff received a written reprimand from Jackson for being absent on January 10, 2024, because plaintiff failed to notify his supervisor that he was going to be in late, finally contacting management about his absence at 2:31 p.m. that day. (*Id.* at 125:6-21, Ex. F). Plaintiff admitted that he woke up late that morning and did not provide any reasoning as to why he did not call management until 2:31 p.m. (*Id.* at 125:22-126:2, 129:5-14).

{¶20} On January 31, 2024, plaintiff received another written reprimand from Jackson after Jackson found plaintiff sleeping on duty at his desk. (*Id.* at 132:8-19, Ex. G). Plaintiff disputes this accusation, although plaintiff admits that the medication he was taking at this time caused him to be drowsy and that sleeping was not allowed while on the clock. (*Id.* at 132:20-134:24, Ex. H).

{¶21} On February 14, 2024, plaintiff received another written reprimand, this time from Reeder, for sleeping at his desk on or about February 7, 2024. (*Id.* at 151:1-152:6, Ex. J). Plaintiff does not admit or deny that he was indeed sleeping at his desk that day, but states that any such issues were the result of side effects of his medication. (*Id.* at 151:22-152:6).

***Plaintiff's Formal Accommodation Request***

{¶22} On February 6, 2024, plaintiff formally requested an accommodation from Naquetta Porter (Porter), OEPA's Americans with Disabilities Act (ADA) Coordinator, for the ability to work up to three days from home due to ongoing drowsiness issues from medication use and stating that the workplace triggered plaintiff's anxiety. (*Id.* at 143:20-145:15; Affidavit of Naquetta Porter, ¶ 5; Ex. I). In support of his request, plaintiff later submitted a form that was completed by his healthcare provider which states that plaintiff is struggling with concentrating, interacting with others, learning, thinking, and working. (Burson Dep. at 166:10-170:23; Porter Aff. at ¶ 5, Ex. K). Despite his healthcare providers note, plaintiff disputes his provider's assessment that he had trouble interacting with others, thinking, or learning. (*Id.*) Plaintiff's provider specifically stated that plaintiff: (1) will need intermittent time off; (2) may benefit from work from home option; and (3) may benefit from flexibility of hours. (Porter Aff. at ¶ 5, Ex. K). This physician form was the only documentation plaintiff provided to Porter to support his requested accommodation. (*Id.*)

{¶23} Plaintiff claimed that he felt isolated in the workplace, and he felt constant anxiety while performing his job duties. (Burson Dep. at 171:1-15, 174:5-13). Plaintiff acknowledged that he would have been performing the same job duties whether he was home or at the office, and plaintiff ultimately could not explain how working from home would have alleviated his problems or assisted with his mental health. (*Id.* at 175:6-176:11). Plaintiff also admitted that he was never disciplined for an inability to concentrate at work or for falling behind on assignments. (*Id.* at 186:12-14).

{¶24} On March 7, 2024, Porter notified Burson that his request to work remotely was denied because plaintiff failed to articulate how working from home would assist him in the performance of his job duties. (Burson Dep. at 188:14-23, 191:5-11, Ex. M; Porter

Aff., ¶ 6). Alternatively, as an accommodation option, Porter advised plaintiff that OEPA was willing to provide flexibility in his work schedule and intermittent time off in accordance with OEPA policy. (Burson Dep. at 191:5-11; Porter Aff., ¶ 6).

{¶25} Thereafter, on March 17, 2024, Burson filed another charge of discrimination with OCRC. (Burson Dep. at 198:10-199:11, Ex. N). After his request was denied, plaintiff sent Porter numerous emails with links to external websites regarding laws and regulations concerning disability accommodation. (Porter Aff. at ¶ 7). Nonetheless, plaintiff still failed to articulate how working remotely would assist him with the performance of his job duties given his medical conditions. (*Id.*)

{¶26} Ultimately, plaintiff appealed Porter's decision to deny his remote work request. (*Id.* at ¶ 8). On April 11, 2024, plaintiff's appeal was denied. (*Id.*, Ex. V). The appeal denial letter states that although plaintiff's appeal was denied, plaintiff was given the opportunity to continue engaging in the interactive process, but he ultimately failed to submit any additional information or documentation demonstrating how remote work would effectively accommodate his medical conditions. (*Id.*)

### *Plaintiff's Termination from OEPA*

{¶27} On March 22, 2024, OEPA conducted a pre-disciplinary meeting with plaintiff in connection with the findings of the administrative investigation covering between February 28, 2024, and March 15, 2024, which found that plaintiff failed to timely notify management that he would be late or absent several times, took extended lunch periods, deviated from his approved work schedule, entered unauthorized leave-without-pay status during the pay period ending on March 9, 2024, and failed to follow direct supervisory instructions regarding correction of his timecard. (Vance Aff. at ¶ 10). On April 1, 2024, plaintiff was issued a three-day working suspension with pay for violations of the absence policy, work hours policy, and conduct and discipline policy. (Burson Dep. at 232:12-233:9; Vance Aff. at ¶ 11, Ex. W.). Ultimately, plaintiff does not dispute that he failed to timely notify management that he was going to be late or absent during this above-listed time period. (Burson Dep. at 233:10-21).

{¶28} On April 12, 2024, plaintiff attended an investigatory interview concerning allegations that he violated OEPA policy, and OEPA wrote down plaintiff's responses to

the interview questions and included them within the investigatory file. (Vance Aff. at ¶ 12, Ex. X). During that interview, plaintiff admitted that he failed to timely notify Jackson that he would be absent on March 29, 2024, although plaintiff stated that he attempted to follow policy but texted the wrong phone number. (*Id.*; Burson Dep. at 239:16-241:22). Plaintiff also had no reason to dispute that management found him sleeping at his desk on April 4, 2024. (Vance Aff. at ¶ 12, Ex. X; Burson Dep. at 242:13-24). Plaintiff also admitted that on April 10, 2024, plaintiff slept through his alarm and did not contact Reeder until 1:30 p.m. (Vance Aff. at ¶ 12, Ex. X; Burson Dep. at 244:6-245:20). Plaintiff disputes the evidence presented that two managers found him sleeping at his desk on April 11, 2024, at approximately 4:15 p.m., but presents no evidence to contradict his supervisor's statements. (Vance Aff. at ¶ 12, Ex. X; Burson Dep. at 248:10-16).

{¶29} On April 19, 2024, plaintiff was notified that a pre-disciplinary meeting was scheduled for April 24, 2024. (Vance Aff. at ¶ 12). Although the meeting began at 10:00 a.m., and plaintiff was present in the building at the time, he did not attend the meeting despite attempts by management and his union representative to reach him. (*Id.* at ¶ 13). The meeting proceeded as scheduled, and a written report was subsequently issued concluding that plaintiff had failed to follow the notifications of absence policy, was found on multiple instances sleeping on the job, and failed to follow a direct instruction from HR regarding leave coding on April 5th. (*Id.*) These findings were forwarded to HR for consideration of discipline. (*Id.*) As a result of the continuous policy violations, on April 26, 2024, plaintiff received a five-day working suspension with pay. (Vance Dep. at ¶ 14; Burson Dep. at 249:3-23, Ex. Y).

{¶30} On May 14, 2024, plaintiff attended another investigatory interview, and OEPA wrote down plaintiff's responses and included them within the investigatory file. (Vance Aff. at ¶ 15, Ex. AA). Plaintiff admitted that due to car troubles on May 2, 2024, he did not get to work on time, did not work a full day, and did not have leave to cover his absence. (*Id.*; Burson Dep. at 253:6-254:22). Plaintiff also admitted that he did not go into work on May 3, 2024, even though he did not have leave to cover his absence. (Vance Aff. at ¶ 15, Ex. AA; Burson Dep. at 257:15-260:5). There were also multiple other instances in early May 2024 of plaintiff admitting to taking unapproved time off without sufficient leave to cover his absence. (Vance Aff. at ¶ 15, Ex. AA). As a result of

the continued violations of policy, plaintiff's employment was terminated with OEPA on June 3, 2024.  (Vance Aff. at ¶ 18-20, Ex. BB).

{¶31} OEPA terminated plaintiff's employment due to failure to correct ongoing violations of OEPA policy despite being offered multiple opportunities to correct his documented issues and absenteeism, but plaintiff ultimately failed to do so.  (Vance Aff. at ¶ 19-21; Johnson Aff. at ¶ 17).  Plaintiff acknowledged that no one at OEPA made any harassing or derogatory remarks toward him based on his mental health condition or his use of leave to seek treatment, although he believes there may have been indirect, snide comments and that changes in his job duties reflected a perceived negative view of his mental health.  (Burson Dep. at 111:1-113:4, 201:12-202:11).  Additionally, OEPA never prevented plaintiff from being able to attend his medical appointments.  (*Id.* at 193:6-8).  Furthermore, plaintiff never filed a charge of discrimination with the OCRC concerning his termination.  (*Id.* at 268:11-23).

{¶32} Ultimately, plaintiff filed the current action and brings claims for (1) disability discrimination in violation of the ADA and R.C. Chapter 4112, which includes allegations that defendant denied plaintiff's requests for reasonable accommodations, stripped plaintiff of job duties, and terminated plaintiff's employment; (2) retaliation in violation of the ADA and R.C. Chapter 4112; and (3) hostile work environment in violation of the ADA and R.C. Chapter 4112.

**Standard of Review**

{¶33} Motions for summary judgment are reviewed under the standard set forth in Civ.R. 56(C):

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  No evidence or stipulation may be considered except as stated in this rule.  A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds

can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶34} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.*

{¶35} If the moving party meets its initial burden, the nonmoving party bears a reciprocal burden outlined in Civ.R. 56(E):

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.

"When a motion for summary judgment is made and supported as provided in Civ.R. 56, the nonmoving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing that there is a genuine triable issue." *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449 (1996).

**Law & Analysis**

***Disability Discrimination – Adverse Employment Actions***

{¶36} Defendant argues that it did not discriminate against plaintiff on the basis of an alleged disability, asserting that plaintiff cannot establish a prima facie case of

discrimination or demonstrate pretext, as defendant had legitimate, nondiscriminatory reasons for its actions.

{¶37} Under federal law, the ADA states that it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. 12112(a).

Similarly, R.C. 4112.02 provides, in pertinent part, that:

It shall be an unlawful discriminatory practice: (A) For any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

In Ohio, "federal case law interpreting . . . Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609-610 (1991); *see also Canady v. Rekau & Rekau, Inc.*, 2009-Ohio-4974, ¶ 32 (10th Dist.) ("Given the similarity between the ADA and Ohio disability discrimination law, Ohio courts look to regulations and cases interpreting the federal act when deciding cases including both federal and state disability discrimination claims."). "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.*, 2012-Ohio-1709, ¶ 25 (10th Dist.), quoting *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist. 1998); *Blanchet v. Charter Communications, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) ("Employees can prove discrimination in two ways, either directly or indirectly, and each has its own test.").

{¶38} "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by

prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). In order for a statement to be evidence of an unlawful employment decision, plaintiff must show a nexus between the improper motive and the decision-making process or personnel. *Birch v. Cuyahoga Cty. Probate Court.*, 2007-Ohio-6189, ¶ 23 (8th Dist.). "Accordingly, courts consider: (1) whether the comments were made by a decision maker; (2) whether the comments were related to the decision making process; (3) whether they were more than vague, isolated, or ambiguous; and (4) whether they were proximate in time to the act of alleged discrimination." *Id*. "[S]tray remarks, remarks by non-decision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination" do not constitute direct evidence. *Johnson v. Kroger Co.,* 160 F. Supp.2d 846, 853 (S.D.Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir. 2003).

{¶39} Conversely, establishing discriminatory intent through the indirect method of proof is subject to the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nist v. Nexeo Solutions, LLC*, 2015-Ohio-3363, ¶ 31 (10th Dist.). "Under *McDonnell Douglas*, a plaintiff must first present evidence from which a reasonable [trier of fact] could conclude that there exists a prima facie case of discrimination." *Turner v. Shahed Ents.*, 2011-Ohio-4654, ¶ 12 (10th Dist.). In order to establish a prima facie case of discrimination, a plaintiff must establish that he "(1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position in question, and (4) was replaced by someone outside of the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 17 (10th Dist.), quoting *Tanksley v. Howell*, 2020-Ohio-4278, ¶ 22 (10th Dist.). "To demonstrate that a co-worker is similarly-situated, the [plaintiff] and the employee with whom the [plaintiff] seeks to compare himself or herself must be similar in all of the relevant aspects." (Cleaned up.) *Bowditch v. Mettler Toledo Intl., Inc.*, 2013-Ohio-4206, ¶ 19 (10th Dist.). "If the plaintiff meets [his] initial burden, the burden then shifts to the defendant to offer 'evidence of a legitimate, nondiscriminatory reason for' the adverse action . . . . If the defendant meets its burden, the burden then shifts back to the plaintiff

to demonstrate that the defendant's proffered reason was actually a pretext for unlawful discrimination." *Turner* at ¶ 14.

{¶40} Defendant has presented evidence demonstrating that plaintiff cannot identify any similarly situated, non-disabled employees who were treated more favorably under comparable circumstances, thereby negating an essential element of plaintiff's prima facie case of discrimination. (Rich. Aff. at ¶ 10; Johnson Aff. at ¶ 18; Vance Aff. at ¶ 22); *Bowditch*, 2013-Ohio-4206 at ¶ 19; *Keogh v. Concentra Health Servs.*, 752 Fed. Appx. 316, 324-325 (6th Cir. 2018) ("plaintiff cites no evidence that any similarly situated, nondisabled employee with a disciplinary record as voluminous as his was treated differently."). The evidence also demonstrates that no other ES2 engaged in comparable conduct to a similar extent, and plaintiff fails to present any evidence to the contrary. (Rich Aff. at ¶ 10; Johnson Aff. at ¶ 18; Vance Aff. at ¶ 22). Accordingly, because plaintiff failed to produce evidence demonstrating the existence of a genuine issue of material fact to establish a prima facie case of disability discrimination under the indirect method, plaintiff failed to satisfy the reciprocal burden imposed by Civ.R. 56(E) and, therefore, cannot prevail on his discrimination claim.

{¶41} Even assuming arguendo that plaintiff could establish a prima facie case of discrimination, defendant has produced evidence of legitimate, non-discriminatory reasons for disciplining plaintiff, denying his request for remote work, and terminating his employment, and plaintiff has failed to produce evidence of pretext. "To establish pretext, the plaintiff must demonstrate the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Ressler v. AG*, 2015-Ohio-777, ¶ 15 (10th Dist.). However, "[a]n 'employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.'" *Hall v. Ohio State Univ. College of Humanities*, 2012-Ohio-5036, ¶ 36 (10th Dist.), quoting *Joostberns v. United Parcel Servs., Inc.*, 166 Fed.Appx. 783, 791 (6th Cir. 2006). "Consequently, where the employer holds an honest belief in its proffered reason, the employee cannot establish that the reason is pretextual even if it is later shown to be mistaken or baseless." *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-

4210, ¶ 78 (10th Dist.), citing *Tibbs v. Calvary United Methodist Church*, 505 Fed.Appx. 508, 513-14 (6th Cir. 2012).

{¶42} Plaintiff concedes that he engaged in multiple policy violations, including sleeping on the job and failing to follow established procedures. (Vance Aff. at ¶ 10, ¶ 12, Ex. X, ¶ 15, Ex. AA; Burson Dep. at 125:6-126:2, 129:9-14, 233:10-21, 239:16-241:22, 242:13-24, 244:6-245:20, 248:10-16, 253:6-254:22, 257:15-260:5). Moreover, the evidence produced shows that plaintiff was provided multiple opportunities to correct such behavior and violations, but plaintiff ultimately failed to do so. (Vance Aff. at ¶ 19-21; Johnson Aff. at ¶ 17). Accordingly, absent evidence to the contrary, plaintiff cannot demonstrate that defendant's proffered reasons for discipline or dismissal were pretext for unlawful discrimination.

{¶43} Additionally, plaintiff's assertion that he was coerced into accepting a voluntary disability separation is unsupported by the record. The evidence reflects that plaintiff elected separation after being provided information regarding the applicable OAC provisions and reinstatement rights, and plaintiff has produced no evidence to suggest that his decision was anything other than voluntary. (Groves Aff. at ¶ 7, Ex. GG). Moreover, plaintiff has produced no evidence that defendant's denial of telework was pretextual rather than based on legitimate business considerations. (Rich Aff. at ¶ 6; Johnson Aff. at ¶ 4-6). Finally, the law is clear that "'temporal proximity cannot be the sole basis for finding pretext.'" *Keogh*, 752 Fed. Appx. at 324, quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). Thus, plaintiff has failed to meet his burden by proffering evidence showing that defendant's reasons for disciplining him, denying plaintiff's request for remote work, or terminating his employment were pretextual.

{¶44} Accordingly, construing the evidence most strongly in plaintiff's favor, the court finds that plaintiff has failed to establish a genuine issue of material fact. Defendant has presented evidence demonstrating that plaintiff cannot establish a prima facie case of discrimination, and plaintiff has failed to produce evidence creating a genuine issue of material fact in rebuttal. Even assuming plaintiff could demonstrate a prima facie case, defendant satisfied its burden under Civ.R. 56(C) by presenting evidence that its actions were based on legitimate, non-discriminatory reasons, namely repeated violations of workplace policies. Plaintiff, in turn, failed to meet his reciprocal burden under

Civ.R. 56(E) to produce evidence of pretext or discriminatory motive. Reasonable minds can therefore only conclude that plaintiff cannot prevail on his discrimination claim premised upon adverse action taken against him.

***Disability Discrimination - Termination***

{¶45} Defendant further argues that plaintiff cannot maintain a discrimination claim arising from his termination from the OEPA because plaintiff failed to file a charge of discrimination with the OCRC and exhaust the required administrative remedies prior to commencing this action. Defendant also maintains that even if plaintiff could properly bring his claim premised upon his termination, plaintiff cannot demonstrate pretext, as defendant had legitimate, nondiscriminatory reasons for its actions.

{¶46} With respect to plaintiff's claim that his employment was terminated because of his disability, plaintiff failed to file a charge of discrimination with the OCRC concerning his termination, and plaintiff conceded as much during his testimony. (Burson Dep. at 268:11-23); R.C. 4112.052(B)(1)(a). Accordingly, since plaintiff did not satisfy his administrative remedies required by statute as he never filed a charge of discrimination with the OCRC specifically concerning his termination, plaintiff cannot maintain a discrimination claim predicated upon that allegation. *See Glenn v. Trumbull Cnty. Commrs.*, 2024-Ohio-1114, ¶ 88 (11th Dist.) (After arguing that the trial court erred by finding that plaintiff's age discrimination claim based on constructive discharge is barred for failure to exhaust administrative remedies, the appellate court agreed "with the trial court that under these circumstances, [plaintiff] was required to file her claim of age discrimination/constructive discharge with the OCRC prior to filing the instant case. As such, she failed to exhaust administrative remedies pursuant to R.C. 4112.052.").

{¶47} Even if plaintiff had filed a charge with the OCRC and complied with the proper procedural requirements for pursuing a disability discrimination claim, plaintiff nevertheless fails to identify a similarly situated non-disabled person that replaced him and fails to establish pretext for the reasons discussed at length above.

{¶48} Accordingly, construing the evidence most strongly in plaintiff's favor, the court finds no genuine issue of material fact. Defendant produced evidence establishing that plaintiff failed to comply with the proper procedural mechanisms before bringing this

action and, even if he had, defendant presented legitimate, non-discriminatory reasons for its actions, with plaintiff failing to produce evidence creating a genuine issue of material fact in rebuttal.    Reasonable minds can therefore only conclude that plaintiff's discrimination claim premised upon his termination fails as a matter of law.

### *Disability Discrimination – Failure to Accommodate*

{¶49} Defendant further asserts that plaintiff cannot show that defendant failed to accommodate his alleged disability when it denied his remote work request.

{¶50} "Since failure to accommodate is expressly listed in the Act's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), 'claims *premised* upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.'"    *Blanchet v. Charter Communs., LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022), quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).  The direct evidence framework under which plaintiff's failure to accommodate claim is analyzed requires him to "establish that (1) [he] 'is disabled,' and (2) that [he] is '"otherwise qualified" for the position despite . . . [his] disability: . . . (c) with a proposed reasonable accommodation.'"  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 417 (6th Cir. 2021), quoting *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020), quoting *Kleiber* at 869.

{¶51} Additionally, employers in Ohio are required to make reasonable accommodations.  *See* 42 U.S.C. § 12112(b)(5)(A); R.C. 4112.02; O.A.C. 4112-5-08(E)(1).  Plaintiff "bears the initial burden of suggesting an accommodation and showing that the accommodation is objectively reasonable."  *Nighswander v. Henderson*, 172 F.Supp.2d 951, 963 (N.D.Ohio 2001).  Examining the reasonableness of plaintiff's request for accommodation, "[r]easonable accommodations consist of '[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable an individual with a disability . . . to perform the essential functions of that position.'"  *Obnamia v. Shinseki*, 569 Fed.Appx. 443, 445 (6th Cir. 2014), quoting 29 C.F.R. 1630.2(o)(ii).  An ADA plaintiff has the burden of "showing 'that the accommodation is reasonable in the sense both of efficacious and

of proportional to costs.'"  *Keith v. Cty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013), quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996).

{¶52} If a disabled employee makes a reasonable accommodation request, the employer is obligated to engage in the "interactive process," which requires "communication and good-faith exploration of possible accommodations."  29 C.F.R. § 1630.2(o)(3); *Kleiber*, 485 F.3d at 871.  "[T]he 'interactive process is mandatory and both parties have a duty to participate in good faith.'"  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir.), quoting *Kleiber*, 485 F.3d at 871.  "[I]n order for the interactive process to work, [b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process."  (Cleaned up.) *Cioroch v. Ohio Dept. of Mental Retardation & Developmental Disabilities*, 2008-Ohio-5725, ¶ 31 (Ct. of Cl.).  Communication between the parties is essential because this "process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010), quoting 29 C.F.R. § 1630.2(o)(3) (2010).  "When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility."  (Cleaned up.)  *Kleiber*, 485 F.3d at 871.

{¶53} Here, the undisputed evidence shows that although the parties began to engage in the interactive process after plaintiff made a formal accommodation request, plaintiff caused the breakdown in the interactive process between the parties. Specifically, despite being given numerous opportunities, plaintiff failed to articulate how working remotely would assist him with the performance of his job duties given his medical conditions.  (Porter Aff. at ¶ 6-7).  Although plaintiff's appeal regarding his request for remote work was denied, plaintiff was notified in writing that he could continue with the interactive process, but plaintiff failed to submit any additional information or documentation demonstrating how remote work would effectively accommodate his medical conditions.  (Porter Aff. at ¶ 8; Ex. V ("If you are dissatisfied with this decision, you may continue the interactive process with the Ohio EPA's ADA coordinator . . .")).

{¶54} Therefore, as the undisputed evidence shows that plaintiff caused a breakdown in the interactive process between the parties, plaintiff's discrimination claim

premised upon a failure to accommodate fails as a matter of law. *Harter v. Franklin Cnty. Bd. of Commrs.*, 2025 U.S. Dist. LEXIS 161089, *39 (S.D.Ohio Aug. 19, 2025) ("an employee's failure to accommodate claim fails if he or she acted in bad faith and caused a breakdown in the interactive process."); *see also Smith v. Shelby Cnty. Bd. of Educ.*, 2024 U.S. App. LEXIS 19388, *6 (6th Cir. Aug. 1, 2024) (holding that the plaintiff "bears responsibility for the breakdown in the interactive process and has forfeited his 'otherwise qualified' status under the ADA."); *Barber v. Chestnut Land Co.*, 2016-Ohio-2926, ¶ 72, fn. 4 (7th Dist.) ("if an employee refuses to participate in good faith or withholds essential information, the employer is not liable under the ADA for failure to accommodate.").

{¶55} Furthermore, plaintiff failed to show how a remote work accommodation would be efficacious and reasonable. *Keith v. County of Oakland*, 703 F.3d 918, 927 (6th Cir.); *Alsept v. Honda of Am. Mfg.*, 2013 U.S. Dist. LEXIS 77530, *24-25 (S.D. Ohio June 3, 2013) ("At the least, the request must explain how the accommodation requested is linked to some disability.").  When asked how working from home would specifically benefit his medical condition and constitute a sufficient accommodation, plaintiff was ultimately unable to explain how remote work would have alleviated his condition or enabled him to perform the essential functions of his position, and his statements were contradictory on numerous occasions.  (Burson Dep. at 173:3-176:11, 194:19-195:13, 247:4-10).  For example, although plaintiff stated that the tasks assigned to him at work caused stress and anxiety that exacerbated his medical condition, he later acknowledged that his job duties would have remained the same regardless of whether he worked in the office or from home, thereby undermining any argument that remote work would have benefited his medical condition.  (*Id.* at 174:18-175:10).  Further, the only documentation plaintiff submitted from his physician in support of his accommodation request merely indicated that he "may benefit" from working from home, without stating that such an arrangement was necessary or providing any explanation as to how it would address his condition.  (Porter Aff. at ¶ 5, Ex. K).  As noted above, plaintiff failed to submit any follow-up documentation from medical providers or otherwise explain how working from home would accommodate his disability despite being afforded numerous opportunities to do so.  (Porter Aff. at ¶ 6-8; Burson Dep. at 223:19-24).

{¶56} Finally, it should be noted that the evidence produced shows that although plaintiff's remote work request was denied, as alternative accommodation options, Porter advised plaintiff that OEPA was willing to provide flexibility in his work schedule and intermittent time off in accordance with OEPA policy. (Burson Dep. at 191:5-11; Porter Aff. at ¶ 6); *Kerwin v. Cmty. Action Agency*, 2023 U.S. App. LEXIS 11718, *12 (6th Cir. May 12, 2023), quoting *Talley*, 542 F.3d at 1108 ("an 'employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation.'").

{¶57} Accordingly, the undisputed evidence demonstrates that defendant offered alternative reasonable accommodations to address plaintiff's disability; however, plaintiff's sole objection concerns the denial of his request to work from home, and, as discussed above, plaintiff failed to articulate how that accommodation would be efficacious and reasonable in light of his condition or how it would enable him to perform his job duties in a manner that in-office work would not. Therefore, plaintiff's discrimination claim premised on a failure to accommodate fails as a matter of law.

### Retaliation

{¶58} Next, defendant argues that plaintiff cannot show that defendant retaliated against him.

{¶59} "Absent direct evidence of retaliatory intent, Ohio Courts analyze retaliation claims using the evidentiary framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 . . . ." *Veal v. Upreach LLC*, 2011-Ohio-5406, ¶ 16 (10th Dist.). Indirect proof of retaliation is thus examined via a similar burden-shifting analysis to discrimination. Here, the elements of the prima facie case that plaintiff must establish are: "(1) [he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Id.* at ¶ 16.

{¶60} "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation." *Sulima v. Tobyhanna Army Depot*, 602

F.3d 177, 188 (3d Cir. 2010). "[U]nlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff has a 'reasonable, good faith belief that [he] was entitled to request the reasonable accommodation [he] requested.'" *Id.*, quoting *Williams v. Philadelphia Hous. Authority Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004), fn. 2. However, a plaintiff does not have a reasonable, good faith belief if she knows that her condition is temporary. *Sulima* at 188-189.

{¶61} Even assuming that plaintiff could establish a prima facie case, his retaliation claim fails at the pretext stage. As discussed previously, defendant has articulated legitimate, non-retaliatory reasons for the challenged actions, and plaintiff has not produced evidence demonstrating that those reasons were a pretext for retaliation. *See Keogh*, 752 Fed.Appx. at 325-326 (Affirming summary judgment on ADA retaliation where plaintiff could not establish pretext). Notably, plaintiff could not identify any facts suggesting retaliatory animus, and his own testimony reflects no such basis. (Burson Dep. at 112:19-113:12, 202:12-16, 270:4-271:6). Moreover, temporal proximity alone is insufficient to establish pretext. *Keogh,* 752 Fed. Appx. at 324. Put simply, there is no evidence of any retaliatory conduct in the record.

{¶62} Accordingly, the court finds that defendant has satisfied its initial burden under Civ.R. 56(C) by demonstrating the absence of evidence supporting plaintiff's retaliation claim. Plaintiff has failed to meet his reciprocal burden under Civ.R. 56(E) to identify specific facts showing a genuine issue for trial. Therefore, defendant is entitled to judgment as a matter of law on plaintiff's retaliation claim.

### Hostile Work Environment

{¶63} Finally, defendant argues that plaintiff cannot show that he was subject to a hostile work environment.

{¶64} "A prima facie case of hostile work environment is established by showing that the employee (1) was a member of a protected class, (2) was subjected to unwelcome harassment because of [his protected status], (3) that had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile or offensive work environment." *Hoyt v. Nationwide Mut.*

*Ins. Co.*, 2005-Ohio-6367, ¶ 68 (10th Dist.), citing *Surry v. Cuyahoga Community College*, 2002-Ohio-5356, at ¶ 37 (8th Dist.); *see also Kellar v. Yunion, Inc.*, 157 F.4th 855, 873 (6th Cir. 2025).

{¶65} "Not all workplace conduct that can be construed as offensive can be characterized as harassment forbidden by statute." *Surry* at ¶ 38-43, citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986). "Conduct that is merely offensive is not actionable as hostile work environment." *Hoyt,* 2005-Ohio-6367 at ¶ 69, citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). In order to determine whether the working environment was sufficiently hostile, the trier of fact must consider all of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's work performance." *Smith v. Superior Prod., LLC*, 2014-Ohio-1961, ¶ 48 (10th Dist.). The alleged conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Id.* at ¶ 87.

{¶66} Plaintiff specifically alleges that the hostile work environment included microaggressions, deliberate exclusion from meetings and communications, coerced "voluntary" disability removal, workplace isolation, discriminatory treatment of medical symptoms, and heightened scrutiny and criticism. (Complaint, ¶ 42). Upon review, the record does not contain evidence from which a reasonable trier of fact could conclude that any of this alleged conduct was based on discriminatory conduct, severe, physically threatening, or interfered with plaintiff's work performance.

{¶67} With respect to plaintiff's claim that he was coerced into taking voluntary disability leave, plaintiff's arguments are unsupported. Upon review, the record reflects that plaintiff elected separation after being provided with information regarding voluntary disability separation and reinstatement rights, which is further discussed above. (Groves Aff. at ¶ 7, Ex. GG).

{¶68} Plaintiff's assertions of heightened scrutiny and criticism likewise do not establish a hostile work environment, as "'[c]onversations between an employee and his superiors about his performance' do not create a hostile work environment 'simply because they cause the employee distress.'" *Kellar,*157 F.4th at 874, quoting *Keever v.*

*City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). Moreover, plaintiff has not produced evidence showing that any such scrutiny was related to his disability rather than his documented performance deficiencies or that it unreasonably interfered with his work performance.

{¶69} The record similarly does not support plaintiff's claims of exclusion or isolation. To the contrary, the record reflects that defendant made efforts to secure plaintiff's attendance at his April 19, 2024 pre-disciplinary meeting; however, despite multiple attempts, plaintiff did not attend. (Vance Aff. at ¶ 12–13). Although plaintiff alleges that he felt isolated due to the placement of his desk in the office and his perception that coworkers did not engage with him, the record is devoid of evidence that any workplace isolation resulted from discriminatory treatment related to plaintiff's medical symptoms.

{¶70} Finally, plaintiff identifies several isolated instances of comments that he characterizes as hostile, including his perception that he was being surveilled when Rich advised him to monitor his timesheets due to discrepancies in his clock-in and clock-out entries, as well as Johnson's inquiry as to whether plaintiff was "having fun" while he was copying documents. (Burson Dep. at 106:23-107:18; 201:22-202:11). However, these isolated remarks are neither severe, pervasive, threatening or humiliating, nor do they interfere with plaintiff's work, and they do not rise to the level of objectively offensive conduct. *Smith*, 2014-Ohio-1961 at ¶ 87.

{¶71} Accordingly, upon review of the evidentiary materials properly before the court, the court concludes that defendant has met its initial burden under Civ.R. 56(C) by demonstrating the absence of evidence supporting plaintiff's claim of a hostile work environment. Plaintiff, in turn, has failed to satisfy the reciprocal burden imposed by Civ.R. 56(E), as he has not identified specific facts showing the existence of a genuine issue for trial. Therefore, defendant is entitled to judgment as a matter of law on plaintiff's hostile work environment claim.

**Conclusion**

{¶72} Based upon the foregoing, the court concludes that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law. Therefore, defendant's motion for summary judgment shall be GRANTED.


_____
LISA L. SADLER
Judge

[Cite as *Burson v. Ohio Environmental Protection Agency*, 2026-Ohio-2131.]

| | |
|---|---|
| JARED BURSON | Case No. 2025-00174JD |
| Plaintiff | Judge Lisa L. Sadler<br>Magistrate Gary Peterson |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO ENVIRONMENTAL PROTECTION AGENCY | |
| Defendant | |

## IN THE COURT OF CLAIMS OF OHIO

{¶73} For the reasons set forth in the decision filed concurrently herewith, defendant's motion for summary judgment is GRANTED. Judgment is hereby rendered in favor of defendant. All previously scheduled events are VACATED. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

LISA L. SADLER
Judge

Filed May 22, 2026
Sent to S.C. Reporter 6/8/26